**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
Civil Action No.: 3:17-cv-266

| | |
|---|---|
| JEFFREY PODESTA, and <br> STREET SEARCH, LLC <br><br> Plaintiffs, <br><br> v. <br><br> JOHN F. HANZEL, ESQUIRE; <br> JOHN F. HANZEL, P.A. ATTORNEYS AT LAW; <br> JOHN P. SCAFIDI; <br> HONEYWOOD ENERGY, LLC (formerly known as Blackwood Energy, LLC); <br> JAYSON COLAVALLA; <br> TONY C. SCOTT; <br> SAMUEL V. WATKINS; also known as WATKINS V. SAMUEL; <br> TALC PROPERTIES FL, LLC; and <br> TALC PRIVATE VENTURES, LLC <br><br> John Does 1-10 <br><br> Defendants. | **JURY TRIAL DEMANDED** |

## AMENDED CIVIL ACTION COMPLAINT

NOW COME the Plaintiffs, Jeffrey Podesta and Street Search, LLC, and hereby allege the following against the Defendants:

## PARTIES

1. Plaintiff, Jeffrey Podesta ("Podesta"), is an adult individual who resides at 145 Bingham Avenue, Rumson, NJ 07760. Plaintiff is a citizen of New Jersey.

2. Plaintiff, Street Search, LLC ("Street Search"), is a limited liability company registered in New Jersey that is owned by Podesta, with a principal place of business located at 145 Bingham Avenue, Rumson, NJ 07760. Plaintiff is a citizen of New Jersey.

3. Defendant, John P. Scafidi ("Scafidi"), is an adult individual who resides at 18033 SW 115 Court, Miami, FL 33187. Upon information and belief, Scafidi is a citizen of Florida.

4. Defendant, John F. Hanzel, Esq. is a licensed North Carolina attorney, with offices at 19425-G Liverpool Parkway, Cornelius, NC 28031. Upon information and belief, Hanzel is a citizen of North Carolina.

5. John F. Hanzel, P.A. Attorneys at Law is a professional corporation registered in North Carolina with offices at 19425-G Liverpool Parkway, Cornelius, NC 28031. Upon information and belief, Defendant is a citizen of North Carolina.

    a. Collectively, hereinafter: "Hanzel."

6. Defendant, Jayson Colavalla, ("Colavalla"), is an adult individual who resides at 3108 Asheton Grove Court, Winston Salem, NC 27127. Upon information and belief, Colavalla is a citizen of North Carolina.

7. Defendant, Tony C. Scott ("Scott"), is an adult individual who resides at 50 Biscayne Boulevard Unit 501, Miami, Florida. Upon information and belief, Scott is a citizen of Florida.

8. Defendant, Samuel V. Watkins, also known as Watkins V. Samuel (hereinafter "Watkins"), is an adult individual who resides at 606 Grantham Lane, Charlotte, NC 28262-1619. Upon information and belief, Watkins is a citizen of North Carolina.

9. Defendant, Honeywood Energy, LLC (formerly known as Blackwood Energy, LLC) (hereinafter "Defendant Company") is a limited liability company registered in North Carolina and, upon information and belief, is owned by Defendants, Scafidi, Colavalla, Scott, and Watkins (collectively, hereinafter "Defendant Company owners" or "the PA Property buyers") with its principal place of business located at 19425-G Liverpool Parkway, Cornelius,

NC 28031. Upon information and belief, Defendant Company is a citizen of North Carolina.

10. Defendant, TALC Properties FL LLC, (hereinafter "TALC Properties"), is a limited liability company registered in the state of Florida. Upon information and belief, Defendant is a citizen of Florida.

11. Defendant, TALC Private Ventures LLC, (hereinafter "TALC Ventures"), is a limited liability company registered in the state of Florida. Upon information and belief, Defendant is a citizen of Florida.

   a. Collectively, hereinafter: "TALC."

## JURISDICTION AND VENUE

12. The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00, and jurisdiction of this Honorable Court is based on diversity of citizenship on the facts recited above. 28 U.S.C. § 1332.

13. Venue is proper in the United States District Court for the Western District of North Carolina because the Escrow Agreement includes a venue provision and the Order of the United States District Court for the Middle District of Pennsylvania held that North Carolina was the proper venue for this action.

## FACTS

14. Roman Lyniuk (hereinafter "Lyniuk") owns Pax Americana and is a business acquaintance of Podesta.

15. In 2011, Lyniuk approached Podesta about an opportunity to participate in the purchase of the Blackwood Mine (hereinafter "PA Property") owned by Nolan Perrin (hereinafter "PA Property owner") in Pottsville, Pennsylvania for twenty-four million dollars ($24,000,000.00) through Scafidi.

3

16. Hanzel is a North Carolina licensed attorney who represented Scafidi and was responsible for handling the financing and closing of the PA Property as well as managing the Escrow Account that held Plaintiffs' money.

17. Lyniuk explained to Podesta that PA Property buyers did not have enough money for the earnest capital down payment of $300,000.00 needed to close on the PA Property.

18. Lyniuk introduced Podesta to Scafidi via telephone and email.

19. Scafidi represented to Podesta and Lyniuk that there was an Agreement of Sale pending on the PA Property, and upon the closing of that property, Scafidi would have a line of credit available to him.

20. Scafidi negotiated with Podesta and agreed that if Podesta would lend the Buyers $300,000.00 he would immediately receive $1.5 million from the line of credit referenced above.

21. On multiple occasions during 2012 and 2013, Podesta traveled to Pottsville, Pennsylvania.

22. Hanzel spoke to Podesta about the PA Property and confirmed that Hanzel was to review all documents regarding the sale of the PA Property, organize the financing from the bank, and manage, protect and control the Escrow Account through the closing of the PA Property.

23. Typically in this type of transaction, in order to "close," the closing attorney has a host of responsibilities in reference to the transfer of the property (such as, review the Agreement of Sale, review closing and financing documents, ensure that title insurance is in place, and most importantly, protect and exercise reasonable care with any funds entrusted to him or under his control).

24. Plaintiffs researched and discovered that Hanzel was a North Carolina attorney in good standing.

25. Plaintiffs were cautious about entering into a deal of this magnitude; however, they proceeded because a licensed attorney was in place to protect and oversee the loan and the property transfer, and was going to protect Plaintiffs' funds in the Escrow Account.

26. Plaintiffs moved forward with the deal because of the perceived protection offered by the presence of an attorney and because the worst that could happen with the $300,000.00 being held in the attorney protected Escrow Account was the return of the funds if the sale of the PA Property fell through.

27. On or about January 13, 2013, Podesta on behalf of Street Search, Lyniuk on behalf of Pax Americana, and Scafidi on behalf of Defendant Company, all entered into an Agreement (hereinafter the "January Agreement") where Street Search would partially finance Defendant Company's purchase of the PA Property in Pottsville, Pennsylvania. (Exhibit A).

28. Plaintiffs, as a part of their research, found that Nolan Perrin, the PA Property seller, did in fact own the PA Property as purported by Scafidi.

29. Hanzel confirmed that the PA Property purchase was legitimate and financing has been obtained (when Podesta contacted Hanzel in early February 2013).

30. Hanzel held himself out to Plaintiffs as the closing attorney for the purchase of the PA Property.

31. Hanzel stated that he would be the Escrow Manager under the Escrow Agreement for the PA Property.

32. Hanzel stated that the financing was in place but he could not reveal the source.

33. Podesta was not alarmed that Hanzel would not reveal the financing source and

speculated that Hanzel did in fact know but did not want to disclose the financing source because he thought Podesta would circumvent the PA Property buyers.

34. On or about February 19, 2013, pursuant to the January Agreement, Street Search, Defendant Company, and Hanzel entered into an Escrow Agreement which further confirmed to Plaintiffs that there was an Agreement of Sale in place for the PA property. (Exhibit B).

35. On or about February 19, 2013, Podesta received instruction from Hanzel's office to wire the funds. (Exhibit C).

36. On or about February 21, 2013, pursuant to the Escrow Agreement, Podesta wired $300,000.00 on behalf of Street Search, through Kearney Federal Savings Bank, to the Bank of America Escrow Account managed by Hanzel. (Exhibit D).

37. On or about February 21 2013, Morgan Temple, an employee of Bank of America, called Plaintiffs to thank them for wiring the funds and to ensure that the deal was in place.

38. The Escrow Agreement stated that the funds were to remain in escrow for forty-five (45) days and be returned if closing on the PA property did not take place within that time period (upon demand).

39. Under the Escrow Agreement, the funds were to be returned within five (5) days of demand.

40. On or about February 22, 2013 a request was made to Scafidi to supply a copy of the Agreement of Sale, loan documents, and closing documents for the PA Property.

41. Scafidi refused the request stating that there was no need to review the Agreement of Sale, loan documents, or closing documents because Hanzel had taken full responsibility pursuant to the both the January Agreement and the Escrow Agreement.

42. Hanzel contacted Podesta the next Friday (March 1, 2013) following the wire transfer to confirm that the funds had been received.

43. Hanzel further stated that the deal was progressing and that he would give weekly updates to Plaintiffs.

44. After that conversation, Hanzel never contacted Podesta again.

45. After further discussion with Scafidi, it was agreed that the documents would indeed be provided, but ultimately it was discovered that neither the Agreement of Sale, the loan documents, nor the closing documents ever existed.

46. Upon information and belief, Hanzel purposely withheld information from Plaintiffs in addition to the Agreement of Sale, title information, the closing date (or lack thereof) and loan documents.

47. For example, Hanzel never disclosed to Plaintiffs that on or about February 27, 2013 Hanzel filed an Amendment of Articles of Organization to change Defendant Company's name from Blackwood Energy LLC to Honeywood Energy LLC with the North Carolina Secretary of State. (Exhibit E.)

48. Hanzel never disclosed to Plaintiffs any information regarding the possession or existence of the requisite PA Property closing documents before transferring the Escrow Funds.

49. Even after Hanzel wired the money, at no time did he notify Plaintiffs that he had not received any documents regarding the Agreement of sale, title documents, or loan documents.

50. On or about April 8, 2013, Plaintiffs repeatedly requested the return of the Escrow Funds.

51. Defendants claimed that the money would be returned shortly and even went as far to state that the funds were under the control of the bank or intermediaries.

52. Hanzel had no authorization to transfer the funds out of the Escrow Account, and never notified Plaintiffs of such action.

53. On or about April 19, 2013, Lyniuk sent Scafidi an email requesting an update. (Exhibit F.)

54. On or about April 22, 2013, Scafidi sent Plaintiffs an email to request a conference call. (Exhibit G.)

55. Hanzel transferred funds that were intended exclusively for the sale of the PA Property to a foreign bank.

56. Upon information and belief, the funds were sent to HSBC London Bank under the name "TALC Properties FL" of which Colavalla, Watkins, and Scott are members.

57. In May 2013, Roman Lyniuk notified Scafidi that Lyniuk intended to meet with the PA Property seller.

58. On or about May 15, 2013, on behalf of Lyniuk, Frank Graves, Esq. spoke to Hanzel, and Hanzel agreed to allow Graves to be the closing attorney on the PA Property and facilitate the transfer of the escrow funds to a new escrow account to be controlled by Graves.

59. Hanzel never revealed to Graves that the escrow funds had already been released.

60. Defendants objected to Lyniuk meeting the PA Property seller and claimed that it would jeopardize the sale because the final negotiations were fragile; however, at this point, Hanzel, acting as the Escrow Agent, had already wrongfully released the Escrow Funds and any negotiations were not only non-existent but would have been moot.

61. Ultimately, the escrow funds were not returned to Plaintiffs but were wrongfully

transferred without Plaintiffs' authorization or knowledge and despite there being no closing on the PA Property.

62. On or about May 17, 2013, Plaintiffs sent Hanzel wiring instructions for the return of the $300,000.00. (Exhibit H.)

63. On or about June 4, 2013, Plaintiffs again demanded the return of the Escrow Funds because sale of PA Property did not occur. (Exhibit I.)

64. Hanzel acknowledged the unauthorized transfer of the Escrow Funds in a letter dated June 6, 2013 to Plaintiffs that stated he would return the Funds as soon as he received the Funds from "the lender or lender's intermediary." (Exhibit J.)

65. To date, no money has been returned to Plaintiffs.

66. Upon information and belief, in violation of the Escrow Agreement, Hanzel wrongfully released $275,000.00 of the funds to Scafidi, Defendant Company and Colavalla through TALC Properties.

67. Upon information and belief, in violation to the Escrow Agreement, Hanzel wrongfully misappropriated the remaining $25,000.00 to himself and/or his law firm.

68. The $25,000.00 that Hanzel wrongfully transferred to himself was to be paid by Defendants and not by the Escrow Account.

69. Since Podesta wired the $300,000.00 to the Escrow Account, all Defendants have refused to return the money and have consistently refused to communicate in a reasonable manner.

70. In August of 2014, Counsel for Podesta contacted counsel for the seller of the PA Property, Matthew Goodrich, Esquire. Mr. Goodrich is an attorney licensed to practice law in the Commonwealth of Pennsylvania and whose office is located in Bangor, PA.

71. Mr. Goodrich stated that the purchase agreement between Scafidi and the PA Property seller dated back to 2011.

72. Mr. Goodrich further stated that the PA Property purchase agreement was voided due to Scafidi's failure to transfer any money to the PA Property seller.

73. Mr. Goodrich explained with certainty that no documents were signed or were even drafted in reference to the sale of PA Property to Defendant Company.

74. Hanzel failed to disclose to Plaintiffs that Colavalla has numerous fraud claims previously against him. (Exhibit K.)

75. Hanzel failed to disclose to Plaintiffs that Watkins received an Order of Judgment against him in North Carolina for more than ten million dollars ($10,000,000.00). (Exhibit L.)

76. Hanzel failed to disclose to Plaintiffs that Watkins received an Order of Summary Suspension to bar him from offering to sell securities in North Carolina. (Exhibit M.)

77. Hanzel failed to disclose to Plaintiffs that Watkins received a Cease and Desist Order to bar him from offering to sell securities in South Carolina. (Exhibit N.)

78. Hanzel conspired with Defendants and Defendant Company and knew or should have known that neither the Agreement of Sale, loan documents nor closing documents existed.

79. Scafidi conspired with Hanzel and the other Defendants and knew that neither the Agreement of Sale, the loan documents, nor the closing documents existed.

80. Colavalla conspired with Hanzel and the other Defendants and knew that neither the Agreement of Sale, the loan documents, nor the closing documents existed.

81. Scott conspired with Hanzel and the other Defendants and knew that neither the Agreement of Sale, the loan documents, nor the closing documents existed.

82. Watkins conspired with Hanzel and the other Defendants and knew that neither the Agreement of Sale, the loan documents, nor the closing documents existed.

## COUNT I – FRAUD/FRAUDULENT MISREPRESENTATION

83. Plaintiffs incorporate by reference the above paragraphs as if set forth at length herein.

84. Defendants collectively intentionally misrepresented and/or omitted material facts to Plaintiffs when it was communicated to Plaintiffs that there was a pending sale of the PA property when in reality the transaction had been voided in 2011.

85. The aforesaid intentional misrepresentations and/or omissions were made in an attempt to procure pecuniary gain from the Plaintiffs.

86. As the intended result of the aforesaid, Plaintiffs reasonably relied upon said misrepresentations and/or omissions to their detriment.

87. As the direct and proximate results of the aforesaid, Plaintiffs sustained the aforesaid damages (incorporated by reference) because Hanzel has not returned the Escrow Funds to Plaintiffs as agreed upon in the Escrow Agreement.

## COUNT II – BREACH OF CONTRACT

88. Plaintiffs incorporate by reference the above paragraphs as if set forth at length herein.

89. At all times material, Plaintiffs and Defendants were parties to the aforesaid express contract(s) (incorporated by reference and in the possession of Defendants) and/or contract(s) and/or warranty(ies) implied at law.

90. By and through their aforesaid actions, Defendants breached their express and/or implied contractual and/or warranty or other duties.

91. By and through their aforesaid actions, Defendants breached their covenant of good faith and fair dealing.

92. As a direct and proximate result of the said breaches, Plaintiffs sustained damages (as set forth above).

## COUNT III – PROMISSORY ESTOPPEL

93. Plaintiffs incorporate by reference the above paragraphs as if set forth at length herein.

94. Defendants made the aforesaid promises to Plaintiffs.

95. Plaintiffs actually and justifiably relied on the Defendants' promises by when Plaintiffs took action by changing their position based on those promises.

96. As described above, Defendants failed to fulfill their promises to Plaintiffs.

97. Plaintiffs suffered actual losses as an actual and proximate result of that failure.

## COUNT IV – UNJUST ENRICHMENT/QUASI-CONTRACT

98. Plaintiffs incorporate by reference the above paragraphs as if set forth at length herein.

99. Defendants wrongly secured a significant financial benefit and it would be inequitable for Defendants to retain the benefit without payment of value.

100. As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs suffered actual loss.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (Plaintiffs v. Hanzel)

101. Plaintiffs incorporate by reference the above paragraphs as if set forth at length herein.

102. Plaintiffs and Defendants were in a fiduciary relationship in his capacity as the Escrow Manager and held himself out as the closing attorney for the PA Property.

103. Defendants' aforementioned conduct constitutes a breach of that fiduciary relationship.

104. As a direct and proximate result of the aforesaid breach of fiduciary duty, Plaintiffs have been damaged (as set forth above).

### **COUNT VI – NEGLIGENCE (SIMPLE & PROFESSIONAL)**

105. Plaintiffs incorporate by reference the above paragraphs as if set forth at length herein.

106. Defendant Hanzel in his capacity as an Attorney and Escrow agent owed a duty to Plaintiffs to exercise reasonable duty of care necessary to protect Plaintiffs from any unlawful actions of Scafidi, Defendant Company and Colavalla.

107. Hanzel knew or had reason to know of Defendants' fraudulent and unlawful conduct through their actions, documentation, reports or otherwise.

108. Hanzel breached his duty of care when he failed to investigate the existence of the purchase agreement between the seller of the PA Property and Scafidi and Defendant Company.

109. Hanzel breached his duty of care when he failed to provide the safekeeping of the Escrow Funds entrusted to him in the transaction detailed above.

110. Hanzel breached his duty of care when he wrongfully released the Escrow Funds despite the condition precedent to the release of the Funds was not met.

111. But for Hanzel's failures outlined above, the Escrow funds would not have been wrongfully released and it is foreseeable that Plaintiffs would suffer damages as a result of that failure.

112. As a result of Hanzel's negligence detailed above, Plaintiffs have suffered – and continue to suffer – damages.

## COUNT VII – CIVIL CONSPIRACY/AIDING & ABETTING

113. Plaintiffs incorporate by reference the above paragraphs as if set forth at length herein.

114. Defendants committed civil conspiracy when they pursued the common goal of pecuniary gain when they deceived Plaintiffs that resulted in the Plaintiffs' loss of at least $300,000.00.

115. Defendants agreed to the course of action taken either expressly or implicitly through ratification of such wrongful action.

## COUNT VIII – CONVERSION

116. The allegations in paragraphs 1 through 115 of this Complaint are realleged and incorporated herein by reference as if fully set forth.

117. The Defendants wrongfully and fraudulently converted the funds that were owned by the Plaintiffs in the escrow account to their own use in violation of the Escrow Agreement, and with the full knowledge that they were wrongfully and fraudulently converting to themselves money which they were not entitled to receive.

118. The Plaintiffs are entitled to recover damages in the full amount of the $300,000 that was wrongfully converted to the Defendants' use from the escrow account, plus interest, expenses, and punitive damages.

## COUNT IX - UNFAIR AND DECEPTIVE TRADE PRACTICES

119. The allegations in paragraphs 1 through 118 of this Complaint are realleged and incorporated herein by reference as if fully set forth.

120. Defendants have unfairly and deceptively engaged in business transactions with the intent to profit at the expense of the Plaintiffs and have fraudulently misrepresented facts to the Plaintiffs with the intent to wrongfully convert the funds deposited in the escrow by the Plaintiffs.

121. The Defendants' made false and fraudulent statements to the Plaintiffs that were intended to deceive the Plaintiffs, and did deceive the Plaintiffs, resulting in a wrongful conversion of the money deposited by the Plaintiffs into escrow.

122. The Defendants' intentional misrepresentations regarding the real estate transaction described herein, Defendants' wrongful conversion of the funds deposited by the Plaintiffs from the escrow account, and the intentional breach of contract (as set forth above) constitute unfair and deceptive trade acts and practices in violation of Chapter 75 of the North Carolina General Statutes.

123. The forgoing acts by the Defendants constitute dealings between businesses, and are "in or affecting commerce", as that phrase is defined by N.C.G.S. §75-1.1.

124. Defendants' unfair and deceptive trade practices have caused and/or will cause damage to the Plaintiffs, including loss of $300,000 deposited in the escrow account, loss of business opportunity, and loss of profit.

125. The unfair and deceptive trade practices described herein necessitated this litigation and caused Plaintiffs to incur substantial attorney's fees and to continue to incur substantial attorney's fees.

126. Defendants are jointly and severally liable to the Plaintiffs for these sums. Plaintiffs are entitled to have and recover from Defendants jointly and severally, as damages for their unfair and deceptive trade practices, an amount in excess of $75,000.

127. Plaintiffs also allege that all damages awarded against Defendants for unfair and deceptive trade practices should be trebled as provided in N.C.G.S. §75-1.16; and that Plaintiffs should have an recover attorney's fees as provided under Chapter 75.

WHEREFORE, Plaintiffs hereby pray the Court as follows:

1. That this Honorable Court enter judgment in their favor and against the Defendants individually, jointly and/or severally in an amount in excess of seventy-five thousand dollars ($75,000) in addition to compensatory and punitive damages;

2. That the Plaintiffs have and recover treble damages against the Defendants pursuant to Chapter 75 of the North Carolina General Statutes, including attorney's fees;

3. That all applicable interest, costs of this suit, inclusive of, without limitation, reasonable attorneys' fees, be taxed against the Defendants;

4. That all issues of fact be tried by a jury; and

5. For such other and further relief as this Honorable Court may deem just and proper.

This 17th day of May, 2017.

**DEAN & GIBSON, PLLC**

/s/ *Michael G. Gibson*
Michael G. Gibson
NC Bar No. 8774
*Attorney for Plaintiffs*

OF COUNSEL:
Dean & Gibson, PLLC
301 S. McDowell Street
Charlotte, NC  28204
704-372-2700 – Phone
704-372-1804 – Facsimile
mgibson@deanandgibson.com